# Udderzook *versus* The Commonwealth.

1. On the trial of an indictment for the murder of "Goss alias Wilson," a photograph of Goss, testified to be like a mutilated body found, was evidence to be submitted to the jury, that the body was that of Goss.

2. Photography is to be judicially recognised as a proper means of producing correct likenesses.

3. A mutilated body, whose face was discolored and swollen, was found, having been buried apparently for some days; the witness who found it had never seen the person before. He might testify that the face resembled a photograph of a person alleged to be the one found; the question whether the witness could identify it, was for the jury.

4. Goss having been a man in the habit of becoming intoxicated, proof that a man called "Wilson" had the same habits, was evidence for the jury on the question as to Wilson and Goss being the same person.

5. Papers signed "Goss" and "Wilson," testified to be by the same hand, were commented on during the trial; the jury retired without taking the papers with them; they afterwards came in and asked that the papers should be delivered to them, which was done: *Held* to be proper.

May 28th 1874, at Harrisburg. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Error to the Court of Oyer and Terminer of *Chester county:* Of January Term 1874, No. 230.

At the August Sessions 1873, of the Court of Oyer and Terminer of the county of Chester, the grand jury found a true bill against William E. Udderzook for murder.

The first count of the indictment was for the murder of "Winfield Scott Goss, otherwise known as A. C. Wilson;" the other count charged him with the murder "of a person whose name is unknown." At the same term, the prisoner being arraigned, pleaded "Not Guilty," and the case was continued until the next October Term. At that term, after the jury was impannelled, the district attorney elected to proceed on the first count alone.

The circumstances connected with this case—the undisputed facts—are substantially as follows:—

The prisoner was the brother-in-law of Goss, they having married sisters. Some time previous to the 2d of February 1872, Goss had obtained insurance on his life for a large amount in several different life insurance companies. The insurance was for the benefit of his wife. About February 1872, he occupied a frame shop on the York road in Baltimore county, Maryland, about three miles from the city of Baltimore; his residence was in the city. He was engaged in his shop in gilding picture frames and also on an invention which was to be a substitute for India rubber. On the 2d of February 1872, the shop took fire and was entirely destroyed. Amongst the ruins were found the remains of a human body; this was alleged to be the body of Goss. The prisoner made the preliminary proofs as to its identity, &c., in order to obtain the insurance for the wife of Goss.

[Udderzook v. Commonwealth.]

Payment of the insurance was refused by the companies, they denying that the body found was that of Goss, and suit was brought by Mrs. Goss against one of them—the New York Mutual Life Insurance Company—in the Circuit Court of the United States at Baltimore. The verdict was for Mrs. Goss. A motion was made for a new trial, pending which, other facts were developed which led to the arrest of the prisoner.

On the 9th of July 1873, John Hurford was travelling on the Gap and Newport turnpike. In going between Penningtonville, a station on the Pennsylvania Railroad, and Cochranville, all in Chester county, he passed "Baer's woods;" he observed buzzards about it and also a very unpleasant odor. Gainer P. Moore, two days later, travelling the same road, observed the same things; he went into the woods about sixty-five feet from the road and discovered "something mysteriously hidden;" a small part was uncovered and the remainder concealed by leaves and a thin covering of earth, and dead limbs of trees placed lengthwise over it. He afterwards returned accompanied by a neighbor. They uncovered the place and found the body of a man. He notified the coroner on the 11th of July. After he came, the body was further uncovered and it was found that the legs and arms of the body were off. In another part of the woods, about sixty-five feet distant, arms and legs were found, also under a slight covering of earth and leaves. The body was put into an ice-box and placed in the lower part of Penningtonville Hall; and on the evening of July 12th was buried in the grave-yard of the Penningtonville Presbyterian Church. The body was again taken up on the 16th for examination by physicians in the neighborhood, and was re-interred on the evening of the same day; it was again disinterred on the 17th for the examination of Doctor Howard of Baltimore.

On the 27th or 28th of June previously, the prisoner and another man left the William Penn Hotel in Philadelphia: on the 30th, the prisoner, with another man, was at West Grove in Chester county, on or near the Baltimore and Philadelphia Central Railroad. From this place both went towards Jennerville, also in Chester county, and situate between West Grove and Penningtonville. On the same evening the prisoner and another man were at the hotel of Samuel C. Jefferis at Jennerville. On the morning of the 1st of July the prisoner obtained a horse from a Mr. Patchell to visit his (prisoner's) brother-in-law, Samuel Rhoads, who lived a short distance from Penningtonville. The prisoner came back to Jennerville with a carriage and horse which he had hired at Penningtonville, and in the evening started from Jennerville towards Penningtonville with the man who had accompanied him. When the prisoner reached Penningtonville the man was not with him, and was never afterwards seen. Baer's woods is on the road between Jennerville and Penningtonville.

[Udderzook *v.* Commonwealth.]

The theory of the Commonwealth was that Goss had not lost his life in the fire in his shop near Baltimore, but that the man who had thus accompanied the prisoner to Jennerville and left that place with him to go to Penningtonville, was Goss, and that the prisoner had murdered him in Baer's woods, mutilated him, and buried him as before described, that the insurance money might be obtained.

The questions on the trial were : Was the body found in Baer's woods that of Goss ? And if so, had he been murdered by the prisoner ?

The case came on for trial, October 29th 1873, before Butler, P. J., and his associates.

The Commonwealth gave evidence of the facts above stated.

G. P. Moore having testified as to the facts of finding the body, as before stated, &c., it was proposed to show witness two photographs and ask him whether he recognised either to be that of the person taken from the grave, to be followed with evidence showing whose photographs they are; to that offer the defendant objected, the offer was admitted, and a bill of exceptions sealed.

The witness testified that one of the figures in the photographs resembled the body found in Baer's woods; witness described in detail the points of resemblance.

A. H. Barnitz testified that he had been acquainted with Goss from about the year 1860; he spoke of his opportunities of knowing Goss; also that he was present when the remains found in Baer's woods were disinterred at Penningtonville, on the 17th of July; that he was asked to examine the remains "critically, to see if I could find any resemblance in them to Goss." The Commonwealth then asked this question: "Were you able to identify the remains, and did you recognise the remains ?" The prisoner *objected to the question ; the court allowed it to be put, and sealed* a bill of exceptions.

The witness testified that he recognised the remains as those of Goss.

A. H. Carter testified that he was agent of one of the insurance companies, and knew Goss; he described his appearance, and testified that about the 17th or 18th of July he saw the remains which had been found in Baer's woods. He was asked by the Commonwealth, "Did you recognise the remains ?" The prisoner objected to the question; the court permitted it to be put, and sealed a bill of exceptions.

The witness testified that he recognised the remains as those of Goss.

L. Engle testified that he had known Goss some months before the burning of his shop in February 1872. After the witness had given a somewhat minute description of the appearance of Goss, &c., the Commonwealth proposed to show by witness, as a means

[Udderzook v. Commonwealth.]

of identification, that "Goss had the habit of drinking intoxicating liquors to excess." The offer was objected to by the prisoner, admitted by the court, and a bill of exceptions sealed. The witness testified that he had seen him "at one time very full of liquor, but only once."

J. W. Langley, manager in Maryland of the Continental Life Insurance Company of New York, testified that he had known Goss about eighteen months previously to the burning of his shop; witness insured the life of Goss; witness examined him; took his measurement, &c.; he and Goss had their photographic pictures taken together. A photograph being shown to witness, the Commonwealth asked the witness, "Is this the picture you had taken?" The prisoner objected to the question; it was allowed by the court, and a bill of exceptions sealed.

The witness said, "That is the picture Goss and I sat for; the standing picture is Goss; the one sitting is I. This is the position we occupied when the picture was taken."

David R. Mullin testified: "I reside in Delaware county, two miles south of Bryn Mawr station, on the Pennsylvania Central Railroad; I know the defendant; first I knew him was when he was may be seven or eight years old; he came to live with me; he lived with me until he was sixteen years old; I did not see him write much while he lived with me; he left me at sixteen to go to a trade, seventeen or eighteen years ago; I have seen him write since he left to go to a trade; after he was twenty-one he came back and lived in my neighborhood a year or more, twelve or thirteen years ago; I have received letters purporting to come from him, and I replied to one; the letters were written in 1871 to which I refer; I saw him once or twice after he left the neighborhood; I saw him writing while he lived with me; he came and boarded with me for two or three weeks of the latter part of the year which he spent in the neighborhood, after he learned his trade; he went to writing school while he thus boarded with me; I saw him writing oftentimes at home during that period; several times; this was twelve or thirteen years ago; it was in 1871 or 1872 that I received the letters; I replied to one; I received no letter in reply to mine; I replied after getting the second letter; I never saw him afterwards; and this is the knowledge I have of his handwriting; I think, from my having seen him write, as I have described, I know his handwriting; I believe I do." (Letters shown witness; one dated October 28th 1871, purporting to be signed by W. E. Udderzook, and the other November 16th 1871, signed in same way.) "I think I got these letters from the post-office at West Haverford."

The Commonwealth asked witness: "Do you recognise the handwriting in these letters?" The defendant objected to this question; it was allowed by the court, and a bill of exceptions sealed.

[Udderzook *v.* Commonwealth.]

Witness said that he recognised the letters to be in the handwriting of the prisoner.

The letter of October 28th 1871 was to witness, and dated "Baltimore;" amongst other things, not bearing on the case, it contained the following:— * * *

"I suppose I have been prompted to this by a *very particular friend of mine,* he is a man of fine appearance, and about my age, and very well to do. But the large circle of acquaintances he is obliged to mingle with has been a great source of annoyance. It is his intention to leave the city for a few months in order to wean himself from so much company. I recommended Coopertown as a quiet little place and just what would suit him. Now, if it would suit you folks to receive him as a boarder, please write soon and name the particulars. He will not want to leave Baltimore for a few weeks. Can we look for you down this fall? we would be pleased to see you in Baltimore. I spent a few days in Jennerville last June. Mother was well at that time. * * * Please write very soon."

The other letter was to Mr. and Mrs. Mullin, and also dated Baltimore, as follows:—

"I wrote a few lines to you some time since, but I have not received an answer. I came to the conclusion you did not receive it. I therefore take pleasure in writing again. The state and city elections are over," &c. * * * "I wrote you in my last in regard to a friend of mine that desired to wean himself from a number of his former associates. He has been in the way of getting a little intoxicated; I thought you might reform him, would it suit you to board him a few months or less. Please answer as soon as possible." * * *

Witness further testified that he replied to the letters after receiving the second, saying that he did not think it would suit him to take a boarder of the kind described in them. On the 22d of June 1872, a person came, saying his name was Alexander Campbell Wilson; he boarded with witness until the 16th of November following, and then left him to go to Athenville, a short distance from Bryn Mawr. Witness then described the appearance of his boarder. The photograph of Goss and Langley, before spoken of, was shown to witness, and the Commonwealth asked him: "Do you recognise either of these photographs; if so, whose is it?" The prisoner objected to the question; it was allowed by the court, and a bill of exceptions sealed.

The witness said: "I recognise the person standing up in the picture; it looks like Wilson."

The Commonwealth proposed "to show the arrival of a man at witness' house (the man already referred to by him), to identify this man as W. S. Goss; to show the connection of the prisoner with him, their relation to each other, and to follow this man up to the time of the murder."

[Udderzook v. Commonwealth.]

The prisoner objects to the offer; it was allowed by the court, and a bill of exceptions sealed.

After the witness had testified as to the arrival of the man as already stated, &c., the Commonwealth proposed "to show that this man was of intemperate habits, as a means of identification, and of connecting him with the individual named in the letter." The prisoner objected to the offer; it was allowed by the court, and a bill of exceptions sealed.

Witness said: "He was a quiet man. I think he had a habit of drinking to excess, but thought he drank but once to excess while with me; for that I discharged him. I received one letter from him after he left for Newark; I do not know his handwriting; I can only say I got a letter purporting to be from him."

The Commonwealth proposed to ask witness "whether the man Wilson left without paying his board, as a means of connecting him with the letter written to witness, before alluded to."

The prisoner objected to the offer; it was admitted, and a bill of exceptions sealed.

Witness said a portion of the board was unpaid when he left.

Under objection and exception, the Commonwealth gave evidence by other witnesses that Goss had habits of intemperance.

M. B. Olby testified that during the summer he resided with Mullin, he knew A. C. Wilson from the time he came to Mullin's till he left; witness directed parcels for Wilson.

The Commonwealth proposed to show "that the packages were directed to A. C. Goss, a brother of Winfield S. Goss, in Maryland."

The prisoner objected to the offer; it was admitted, and a bill of exceptions sealed.

The witness testified that, at Wilson's request, he sent several small packages for him by Adams's Express; witness received them from Wilson, sealed, with a slip of paper, on which was written the name and address which were to be written on the parcels; they were, "A. C. Goss, Calvert street, Baltimore, Maryland, care of A. Stevens & Co." At Wilson's request, witness got letters for him from the post-office; they had the Baltimore postmark.

Under objection and exception, the witness testified that there was a furniture card on the envelope; it was Stevens or Stevens & Co.

Under objection and exception, witness testified that he and Wilson conversed about people residing in Baltimore who were their mutual acquaintances.

J. N. Marshall, an agent for Adams Express Company at Bryn Mawr station, testified that October 16th 1872, and afterwards, he received packages at the station for A. C. Wilson and delivered them to him. This evidence was objected to by the prisoner, but the Commonwealth saying it would be followed by evidence show-

[Udderzook *v.* Commonwealth.] .

ing where the packages were from, it was admitted and a bill of exceptions sealed.

Witness said the packages came in the usual course of the company's business; from the way-bills accompanying them, they came from Baltimore.

Witness further testified, under objection and exception, that the picture of the man standing in the photograph looked much like the man to whom he gave the packages.

D. Bachrach, the photographer, testified that he took the picture; that he knew Goss. The picture was that of Goss and Langley.

H. G. Litzenberg testified that he lived at Coopertown, near Mullin's; he knew a man known as A. C. Wilson; he gave witness a due-bill dated November 23d 1872; it was signed "A. C. Wilson." A paper being shown to witness, he said he believed that to be the due-bill.

Elizabeth Tombs, who lived in Newark, N. J., testified that Wilson boarded in her family from November 29th 1872, to June 23d 1873; that the prisoner came there to see him May 11th 1873, and spoke of him by the name of A. C. Wilson. She then described Wilson's appearance, spoke of his clothes, a ring which he had, &c. She also said that he frequently received letters for him from the postman at the door; some were postmarked Baltimore. Sometimes Wilson would scratch words off. It having been admitted that the prisoner married Eliza Arden of Baltimore, witness, under objection and exception, said, " I saw one letter of his he endorsed; it was to Miss Eliza Arden, Baltimore."

The Commonwealth proposed to show that " A. C. Goss visited Wilson, by showing that a man called at the house to see Wilson bearing a strong resemblance to him, and to identify this man as A. C. Goss." The prisoner objected to the offer; it was admitted and a bill of exceptions sealed.

Witness said: " Another man visited Wilson and was introduced as his brother-in-law; he looked like him; this was the last of January." She further testified: " This man Goss called in August last; he represented himself as Goss; it was the man who called in January and was introduced as Wilson's brother, who resembled him.

Emma Taylor testified that she knew Wilson at the house of Mrs. Toomly; she described him; spoke of the ring, &c. She recognised the standing figure in the photograph as Wilson's. Under objection and exception, she testified that he left Mrs. Toomb's on the 25th of June and said he was going to Philadelphia.

She said that she received notes from him; sometimes two or three a day, and sometimes once a week; that she had a recollection of his handwriting, but not a very distinct one.

The Commonwealth proposed to show to witness the letters to

[Udderzook *v.* Commonwealth.]

Mullin purporting to be from Wilson, and one addressed to S. R. Downs, dated June 29th 1873, and "ask her if she recognises the handwriting in them; if so, whose it is?"

The offer was objected to by the prisoner, allowed by the court and a bill of exceptions sealed.

Three papers were then shown witness, with signature, &c., concealed; she answered as to the Mullin letter: "I know this handwriting; it is that of A. C. Wilson, to the best of my knowledge." As to the Downs letter she said: "This is also the character of A. C. Wilson's writing; I think it is his handwriting." As to the third she said: "This also looks like his, but is not so distinct; to the best of my knowledge, it is his." The third was a letter without date, signed "Winfield S. Goss."

The Downs letter was:—

"S. R. Downs.
          Success L. i.
          Dear Sir—i have just noticed your advertisement in the New York herald. please drop me a few lines and state if you could not ACCOMMODATE an humble unassuming and good natured individual, as i profess to be, for less money than your advertisement calls for, am easy to please, can put up with anything, all i want is to get in the country. Please let me hear from you at any rate with directions how to find your house.
          "Yours most respectfully,
                         "A. C. Wilson,
          "331 Mulberry St., Newark, N. J."

The Mullin letter was:—

"New York, Jan. 3, 1873.
          "Dear Governor—I have but just time to write you a few lines merely to inform you of my whereabouts and good health, &c., &c. Well as you see from this letter I am again in the great metropolis, hard at work, and working harder than I ever did before in my life. I am with a large firm here, that was among the sufferers from the Boston fire. Their loss is near a $100,000, and they are working hard to regain their former footing. I am glad that I have come to them in their distress, for they were sorely in need of my assistance (humble as it may be), for in these hurried times they want no new hands, but old ones, and as I am familiar with their business as well as their custom, I need no instructions. I have been to Philadelphia twice and to Boston once since I left you, and I leave here again to-night for Boston, and as soon as I return, I am off for the West for them. So you see, my dear Governor, I have my hands full. I have not had any leisure moments to myself since I have been here and will not until I return from my Western trip. These men have been my friends in times past, and I am glad to have the opportunity to reciprocate

[Udderzook *v.* Commonwealth.]

their kindness.   Gov. you know that I was looking for a package by express when I left you.   Well in that package I expected a $100.   I have received the package, but only received $40 instead of $100.   The truth of this you can find out from the clerk at Bryn Mawr station.   Had I received the $100 I should have been able to pay you what I owe you, but as it is I hope you are not uneasy for I will not long remain in your debt.   Now a few words about family matters and I will close my letter.   The time I lived in your family have been very pleasant and agreeable.   I was treated by all like a gentleman and tried to the very best of my ability to act in accordance, and I flatter myself that I succeeded until within a few days of my departure and then that DM old fool made me mad with his insults and then I made an ass of myself by drinking whiskey.   I would not have had it happen for anything that I possess, particularly while in your house, but I can only say now that I am heartily ashamed of it, and hope that I will at no distant day have an opportunity to make atonement for it.   I wish that I had all to go over again.   How different I would act.   I would give that old scoundrel the benefit of my foot at the beginning and that would have put an end to it, but I will not forget him and will yet pay him the debt that I owe him with interest.   Enclosed please find $1.   Please give it to him.   It is $1 that I borrowed from him.   I did not intend to pay him when I borrowed it, but I don't want him to say that I owe him anything EXCEPT —— —— ——.   My affairs in Tennessee are progressing favorable and I hope soon to be all right.   Please remember me with kindness to your good wife and to ANNIE.   Also to all inquiring friends.   I have written Abe Good and he is to send me my ring and screw-driver, and if you have no objection please give him watch.   I need it very much in travelling.   Write me a few lines and send it in the package that Abe is sending me.   Hoping to hear from you soon I remain as ever,

" Yours most respectfully,

"A. C. WILSON."

The third letter was :—

" Sir : I was much disappointed in not getting some money to settle my bill, but please don't feel uneasy, for I will most assuredly send it to you.   I have received a despatch which calls me to Philadelphia, but I hope I will not be detained long, for I am not through with my business here, and will soon return.   If not, rest assured that I will pay my indebtedness to you in a few days.   Hoping that I have not incurred your displeasure, and that I will meet you again,

" I remain yours most respectfully

"W. S. GOSS."

This letter was alleged to have been written to Dr. Stevens, and testified to by witnesses whose testimony is hereafter given.

[Udderzook v. Commonwealth.]

Much testimony was given by the Commonwealth from different witnesses, describing the appearance of Wilson, his ring, &c.; also that the standing figure in the photograph resembled Wilson.

J. W. Butler testified that he resided in Baltimore, and had known Winfield S. Goss for several years; that he knew his handwriting; that the letter said to be Dr. Stevens's was Goss's handwriting; also the letter to Downs; that of January 3d 1873, to Mullin; also the due-bill to Litzenberg. Witness testified that several other signatures, "A. C. Wilson," were the handwriting of Goss.

O. F. Breese, agent of the Mutual Life Insurance Company, testified that they had insured W. S. Goss on the 1st of May 1868, and that the policy was in force on the 2d of February 1872. The witness knew Goss's writing; the signature to the application for the insurance was his. The insurance was in favor of Eliza W. Goss.

T. C. McGuire, agent for the Travellers, &c., Life Insurance Company of Hartford, testified that Goss made an application for insurance in that company, and that his application shown to witness was that signed by him in the presence of the witness.

The Commonwealth gave evidence by several witnesses of the burning of Goss's shop at Baltimore, of the prisoner's deportment on the occasion, of the extricating a body from the burning, and of many circumstances connected with the fire.

S. H. Downs testified that he received the "Downs" letter in June 1873.

The Commonwealth examined a number of witnesses as to the person, appearance, &c., of Goss.

It was admitted by the prisoner that suits had been brought in Baltimore against several of the life insurance companies; that the companies resisted payment; that a verdict had been rendered against the Mutual Insurance Company of New York; that a motion had been made for a new trial on the ground that the verdict was against the instruction of the court; that the motion was pending at the time of the alleged homicide; and that the other suits were still pending. It was admitted also that the prisoner testified in the suit tried.

The Commonwealth gave evidence that the prisoner went in the railroad cars from Wilmington to Philadelphia on the 28th of June 1873; that he was at the William Penn Hotel, Philadelphia, about the same time and asked for A. C. Wilson, who met him; and that they left the next morning together. Wilson had come to the hotel June 26th. Also, that Mr. Pyle, who saw him on the 30th of June at West Grove, about ten miles from Baer's woods, said the man who was with him resembled the standing figure in the photograph.

S. C. Jefferis testified that the prisoner and a stranger came to

[Udderzook v. Commonwealth.]

his hotel in Jennerville on the night of the 30th of June 1873; they lodged there that night. Next morning prisoner came downstairs and said his friend was sick and would not be down to breakfast. He took breakfast to him. Prisoner went away the next morning, July 1st, and came back in the evening; his friend was then standing on the porch. The prisoner and his friend left the house of witness on the evening of July 1st in a carriage. Witness never saw the stranger again. They drove away in the direction of Baer's woods and Penningtonville.

There was evidence from a number of witnesses that the prisoner was the man who was at Jefferis's with the stranger.

C. Hann, bookkeeper of National Mechanics' Bank, Baltimore, testified that W. S. Goss kept an account at the bank; that on February 1st 1872, he got his bank-book with cancelled checks and drew the balance of his account, $368.75, on check dated February 2d 1872. Witness said he thought the signature to the "Stevens's" letter was the handwriting of Goss.

The Commonwealth offered in evidence the letter said to be Dr. Stevens's; letter A. C. Wilson to S. R. Downs; letter A. C. Wilson to Mullin, dated January 1872; due-bill to H. G. Litzenberg; check for $368.75 spoken of by Hann; and also other papers testified to in the cause.

There was evidence that the prisoner hired a horse and carriage at Penningtonville, about two o'clock in the afternoon, saying that he would return at six or seven o'clock; he returned about twelve at night; the dasher of the carriage was bent toward the horse, the rivets broken, and the carriage otherwise injured; a ring and collar-button were found next morning under the dasher of the carriage. The ring was recognised by witnesses as that which Wilson wore.

The Commonwealth gave evidence by John Hurly, who resided within a field of Baer's woods, that about midnight of July 1st, he heard a noise as of a man hallooing; "as if two men were scolding very severe—very wicked;" one cried "Oh!" heard a wagon and horse going very fast towards Penningtonville; the noise came from Baer's woods; he saw a light in the woods.

Other witnesses testified that they saw smoke and fire in or near Baer's woods early in the morning of July 2d; that fragments of clothing were afterwards found where there had been fire; there were no marks of fire anywhere else. Also that the prisoner was seen alone by several persons next day, after he had gone away with the stranger.

The Commonwealth gave a very large amount of evidence, besides that stated, and closed.

The prisoner then gave much testimony, principally bearing on the question of the identity of the body found in Baer's woods with W. S. Goss.

[Udderzook v. Commonwealth.]

The court charged the jury on the 7th of November 1873. On the 9th the jury came in. The prisoner was brought in by the sheriff; his counsel also being present. The jury asked that the various papers which had been given in evidence and commented upon by the counsel for the prisoner and the Commonwealth, should be delivered to them. The court ordered them to be delivered to the jury, and they retired. After some time they returned, and rendered a verdict that the prisoner was " Guilty of murder in the first degree."

After a motion for a new trial had been overruled, the court, on the 13th of December 1873, sentenced him to be hanged.

The prisoner took a writ of error.

He assigned for error :—

1–20. The rulings of the court on the offers of evidence.

Also that the court erred—

In permitting the photograph of Winfield Scott Goss to be used by the witnesses, in identifying the remains found.

In permitting the photograph of Winfield Scott Goss to be used by the witnesses, in identifying A. C. Wilson as Winfield Scott Goss.

In sending the letter of A. C. Wilson to David R. Mullin, the letter of A. C. Wilson to S. R. Downs, and the letter of Winfield Scott Goss to Dr. Steele, hotel registers, and the applications of Winfield Scott Goss for insurance, to the jury in their room for their examination and comparison.

That the Commonwealth failed to identify the body found as the body of Winfield Scott Goss or any other person; and that the evidence failed to prove the guilt of the prisoner, and he should have been acquitted.

*J. F. Perdue* and *W. MacVeagh*, for plaintiff in error.

*A. Wanger*, District Attorney, and *W. M. Hayes*, for Commonwealth.

Chief Justice AGNEW delivered the opinion of the court, July 2d 1874.

This is indeed a strange case, a combination by two to cheat insurance companies, and a murder of one by the other to reap the fruit of the fraud. Winfield Scott Goss, an inhabitant of Baltimore, had insured his life to the amount of $25,000. He was last seen at his shop, on the York road, a short distance from Baltimore, on the evening of the 2d of February 1872, in company with William E. Udderzook, his brother-in-law; the prisoner, and a young man living near. They left him to go to the house of the young man's father.

In a short time the shop was discovered to be on fire. After it

had burned down, a body was drawn out of the fire, supposed to be that of Goss. Claims were made upon the insurance companies, the prisoner being active in prosecuting them. On the 30th of June 1873, the prisoner and a stranger, a man identified as Alexander C. Wilson, appeared at Jennerville, in Chester county, this state, and remained over night and the next day. In the evening, July 1st, the prisoner and this stranger left Jennerville together in a buggy. Next day, on being met and asked what had become of his companion, the prisoner said he had left him at Parkesburg. On the 11th of July, the body of a man, identified on the trial as W. S. Goss, or A. C. Wilson, was found in Baer's woods, about ten miles from Jennerville; the head and trunk buried in a shallow hole in one place and the arms and legs in another. The stranger who was with the prisoner at Jennerville, identified as A. C. Wilson, was traced from place to place, living in retirement, from June 22d 1872, until within a day or two of the time when he appeared with the prisoner at Jennerville. During this interval this prisoner and Wilson were seen together several times, under circumstances indicating great intimacy and privacy. Wilson has not been seen or heard of since the evening of July 1st 1873, when he left Jennerville in company with the prisoner. The great question in the case was the identity of A. C. Wilson as W. S. Goss. This was established by a variety of circumstances and many witnesses, leaving no doubt that Goss and Wilson were the same person, and that the body found in Baer's woods was that of Goss.

All the bills of exceptions, except one, relate to this question of identity, the most material being those relating to the use of a photograph of Goss. This photograph, taken in Baltimore on the same plate with a gentleman named Langley, was clearly proved by him, and also by the artist who took it. Many objections were made to the use of this photograph, the chief being to the admission of it to identify Wilson as Goss; the prisoner's counsel regarding this use of it as certainly incompetent. That a portrait or a miniature, painted from life and proved to resemble the person, may be used to identify him cannot be doubted, though, like all other evidences of identity, it is open to disproof or doubt, and must be determined by the jury. There seems to be no reason why a photograph, proved to be taken from life and to resemble the person photographed, should not fill the same measure of evidence. It is true the photographs we see are not the original likenesses; their lines are not traced by the hand of the artist, nor can the artist be called to testify that he faithfully limned the portrait. They are but paper copies taken from the original plate, called the negative, made sensitive by chemicals, and printed by the sunlight through the camera. It is the result of art, guided by certain principles of science.

[Udderzook *v.* Commonwealth.]

In the case before us, such a photograph of the man Goss was presented to a witness who had never seen him, so far as he knew, but had seen a man known to him as Wilson. The purpose was to show that Goss and Wilson were one and the same person. It is evident that the competency of the evidence in such a case depends on the reliability of the photograph as a work of art, and this, in the case before us, in which no proof was made by experts of this reliability, must depend upon the judicial cognisance we may take of photographs as an established means of producing a correct likeness. The Daguerrean process was first given to the world in 1839. It was soon followed by photography, of which we have had nearly a generation's experience. It has become a customary and a common mode of taking and preserving views as well as the likenesses of persons, and has obtained universal assent to the correctness of its delineations. We know that its principles are derived from science; that the images on the plate, made by the rays of light through the camera, are dependent on the same general laws which produce the images of outward forms upon the retina through the lenses of the eye. The process has become one in general use, so common that we cannot refuse to take judicial cognisance of it as a proper means of producing correct likenesses.

But happily the proof of identity in this case is not dependent on the photograph alone. Letters from Wilson, identified as the handwriting of Goss; a peculiar ring, belonging to Goss, worn upon the finger of Wilson; the recognition by Wilson of A. C. Goss as his brother; packages addressed to A. C. Goss and envelopes bearing the marks of the firm with which W. S. Goss had been employed coming and going to and from Baltimore, and many other circumstances following up the man Wilson, leave no doubt of his identity as Goss, independently of the photograph.

The objection to the proof of Goss's habits of intoxication is equally untenable. True, the habit is common to many, and alone would have little weight. But habits are a means of identification, though with strength in proportion to their peculiarity. The weight of the habit was a matter for the jury.

It is unnecessary to follow the bills of exceptions in detail. They all relate to facts and circumstances bearing on the question of identity. If the bills of exception are many, they only denote that the circumstances were numerous, and in this multiplication consists the strength of the proof.

They are the many links in a chain so long that it encircles the prisoner in a double fold. The questions put to G. P. Moore, A. H. Barintz and A. R. Carter were unobjectionable. Whether they really could not identify the dark and swollen face of the corpse, it was not for the court to decide; its weight belonged to the jury.

There was no error in permitting the jury, after their return into the court for further instructions, to take out with them, at their

26 P. F. Smith—23

[Udderzook *v.* Commonwealth.]

own request, the letters, check, due-bill and application for insurance papers which had been proved, read in evidence and commented on in the trial. The appearance, contents and handwriting of these documents were no doubt important, and to be inspected by the jury, who could not be expected to carry all these features in their minds. It is customary in murder cases to permit the jury to take out for their examination the clothing worn by the deceased, exhibiting its condition, the rents made in it, the instrument of death, and all things proved and given in evidence bearing on the commission of the offence.

We discern no error in this record, and therefore affirm the sentence and judgment of the court below, and order this record to be remitted for execution.