## Commonwealth v. Roller.

*John H. Maurer*, Assistant District Attorney, for Commonwealth.

*John Whitaker Lord*, for defendant.

GORDON, JR., J., March 28, 1930.—This is a motion for a new trial, in which a single but rather novel question is presented for our determination. During the summer of 1929, the defendant, who is a milkman, entered and robbed upwards of seventeen temporarily vacant houses on or in the neighborhood of his milk route. He was apprehended while attempting to enter one of the houses with a pass-key, and in his milk wagon was found the proceeds of a similar robbery which he had committed just before being arrested. The

police, in searching his home later, discovered a large quantity of articles which he had stolen from the houses mentioned in the course of his systematic depredations, and subsequently relatives or friends produced articles given to them by him which had been similarly stolen from the houses robbed. After his arrest, he confessed to Captain Connolly, the head the Detective Bureau, to the various burglaries that he had committed. His confession was taken and recorded by a talking motion-picture machine, and the record thus made, which was offered in evidence and admitted over the objection of the defendant, was exhibited to the jury upon a screen.

The admission of this talking motion picture, or "movietone," as it technically known, is the only reason assigned for a new trial in the motion now before us for consideration. This raises the question of the admissibility of such evidence in a judicial proceeding. In determining that question there are two principal lines of consideration to be borne in mind—first, the adequacy of the authentication of the evidence offered; and, second, its general relevancy and admissibility.

Upon the first of these questions the Commonwealth presented the testimony not only of the photographers who took the pictures, but also that of expert witnesses, respecting the method by which such pictures are made and reproduced, and their reproductive accuracy upon the screen. This was shown to be fundamentally that of ordinary photography, both as to the pictures themselves and the sound-recording feature of the instruments used. Both the pictures and the sound are recorded on a long strip of film, the sound portion of the record being impressed photographically and synchronously along a narrow strip on one side of the film. The entire film may be several hundred feet in length, depending upon the length of time consumed in the making of the record, and for developing purposes it is necessary at times to cut the film. This results in the removal and loss of one picture or "frame," the severed film being then respliced with that picture missing. This was done in the present case, in one instance, in the middle of the film. The loss of one picture in the developing process, however, does not interfere with the completeness or accuracy of the record made, because, in taking motion pictures, the successive photographs of which the motion picture consists are taken at the rate of sixteen a second, and the loss of one picture or frame would be unnoticeable and negligible in the visual reproduction and completeness of the record. The moving picture was shown to be, as already indicated, merely a series of distinct and separate photographs, each one complete in itself, and exhibiting the scene and relative postures and positions of objects in it at the instant of taking. As they are taken and reproduced, however, at the rate of sixteen frames per second, the exhibition upon the screen in succession of the different positions of the subject results, because of the optical phenomenon of the persistence of vision, in an accurate and perfect reproduction of the motion of the subject during the time in which the exposures are made. The entire production thus possesses the same accuracy as the individual photographs comprising the film, with the added advantage of the resultant visualization of motion. The evidence overwhelmingly, and without contradiction, therefore, established the fact that the movietone offered in evidence scientifically reproduces the progressive actions and sounds that transpired within the range of the recording machine when the record was made with the same accuracy as the individual photographs reproduce the scene existing at the instant they were being taken.

With respect to the question of a successful tampering with such a film, it was shown that a moving picture contains advantages in regard to the ability

to detect elisions or insertions of scenes or pictures—that is to say, to detect alterations in the continuity of the film—beyond that possessed by a single still photograph. The film has stamped upon it, at regular distances, letters or numbers indicating the sequence of the pictures, and any removal or insertion of sections of the film could readily be detected by a careful inspection and check of the sequence of the numbers. In addition, the removal from, or insertion of pictures in, such a film by the process technically known as cutting and splicing is easily detectable by visual and manual examination of the film itself, since the process of resplicing requires the superposition and cementing of one edge of the film upon the other, with a resultant thickening of it at that point. The danger of imposture from deliberate manipulation of the film is thus practically eliminated.

So far as the particular film offered in evidence in this case is concerned, the defendant's own expert conceded, after thorough examination of it, that there had been no eliminations or insertions in the record, and that the film, in his judgment, accurately reproduced the scene taken. This scientific demonstration of the correctness of the film which was received in evidence, together with the testimony of witnesses, who were present when the scene was taken, and who participated in the mechanical work of taking it, that the film did truly and accurately represent the scene taken, sufficiently authenticated the film to make it admissible in evidence, if otherwise it was relevant and admissible.

This leads us to a consideration of the second line of inquiry involved in the admission of such evidence. What has already been said fully discloses the fundamental nature of movietone pictures and demonstrates that they are, in basic characteristics, no different, on the one hand, from ordinary photography, in regard to the visual picture reproduced, and, on the other hand, from phonographic records, in regard to the auditory recording of sound. The principles that underlie their admissibility into evidence, therefore, differ in no way from those governing the admissibility of still pictures and phonographic records.

When thus analyzed, the difficulty in admitting talking motion pictures largely vanishes, and the objections that are frequently advanced to their admissibility are seen to rest principally upon either a mistaken understanding of their nature, or, through a naturally conservative hesitation to adopt that which is new and untried, upon the fear, for which the evidence shows there is little ground, of being misled by imposture and fraud in the manufacture of so-called "fake" pictures. The latter feature of the objection to motion pictures is the one most frequently suggested and, it seems to us, the least worthy of consideration. It appertains to all forms of evidence, whether oral or physical. It is easier for a wicked man to lie under oath as to what he saw or did or heard, than for him to manufacture or alter a scientifically made moving-picture photograph. Even still photography is notoriously subject to faking. All material things which may have evidential value, from an ancient painting to a forged will, can, in the hands of a master craftsman, be faked as successfully as the motion picture. Yet all such evidence is admissible in a judicial proceeding, if witnesses, whose credibility is unimpeached, testify to its identity and correctness. The possibility of imposture by motion picture is not in itself, therefore, a ground for rejecting one which is adequately authenticated. The novelty of this form of evidence, together with the familiarity of the public with commercial exhibitions of moving pictures, in which, by trick photography and skillful cutting and splicing, impressions of acts seemingly impossible of performance are presented, seems to be the underlying reasons

for the hesitation to receive such pictures in evidence. It must not be forgotten, however, that, although the scenes recorded in commercial moving pictures are created for the purposes of the picture, the picture itself faithfully records the reality of what occurred; it is merely the deliberate manipulation of the scene or film which produces the misleading impression. Of course, the novelty of the motion picture is no reason for rejecting it. The courts have always been hospitable to new inventions or discoveries of science, when their accuracy and reliability as aids in the determination of truth are established. All knowledge purveys to the law, and from the domains of every art and science it draws the weapons by which it discovers truth and confounds error. The still photograph, the X-ray, the dictograph, the fingerprint, the phonograph, the microscope, and even the bloodhound, have all been used and received by judicial tribunals in the proof of matters depending upon evidence; and, in all such cases, the preliminary investigation was directed to the proper authentication of the evidence, and not merely to the question whether imposture might be successful.

Thus, in Moncur v. Western Life Indemnity Co., 269 Pa. 213, photostatic copies were admitted for comparison with admittedly genuine signatures. In Beardslee v. Columbia Township, the court said: "Photographs are competent evidence, and, when properly taken, are judicially recognized as of a high order of accuracy. See Udderzook v. Com., 76 Pa. 340. But in careless, or inexpert, or interested hands they are capable of very serious misrepresentation of the original. Before they are permitted to be used in the trial, therefore, there should always be preliminary proof of care and accuracy in the taking of them, and of their relevancy to the issue before the jury;" in C. & J. Electric Ry. Co. v. Spence, 213 Ill. 220, and Miller v. Mintun, 73 Ark. 183, X-ray photographs taken by an expert were held admissible; in People v. Jennings, 252 Ill. 534, the use of photographs of fingerprints discovered at the scene of the crime, by comparing them with enlarged photographs of fingerprints of the defendant, were permitted; so, also, upon the general admissibility of photographs, see United States v. Ortiz, 176 U. S. 422; Marcy v. Barnes, 16 Gray, 161; Kurzrok v. United States, 1 Fed. Repr. (2nd) 209. Again, in State v. Knight, 43 Me. 131, enlarged diagrams made by an expert of the appearance of blood in various conditions through the microscope were permitted to be used for the purpose of illuminating the witness's testimony. Telephone conversations have been freely received in evidence upon a proper identification of the voice: Pennsylvania Trust Co. v. Ghriest, 86 Pa. Superior Ct. 71; Dunham v. McMichael, 214 Pa. 485; Olmstead v. United States, 277 U. S. 438; and X-rays, skiographs and radiographs have also been accepted as a means for proving facts in dispute: C. & J. Electric Ry. Co. v. Spence, supra; Wallace v. Pennsylvania R. R. Co., 222 Pa. 556. In this connection, an interesting article appears in the Scientific American, of January, 1928, at page 57, where a murdered man was identified by means of X-ray photographs of a skull. The dictograph, with its advantages in reporting conversation, has also been recognized as a legitimate agency for the discovery of truth: State v. Minneapolis Milk Co., 124 Minn. 34; Com. v. Petrilli, 2 Western Law Jour. 1.

This very incomplete review of the scientific agencies that have been recognized and received as valuable in judicial investigation is sufficient to indicate the receptive attitude of the law toward any reliable mechanism which scientific knowledge has produced for the recording or discovery of facts.

Turning now to those mechanical contrivances most nearly associated with the movietone, we find that phonographic records have been received in evidence. Thus, in Boyne City v. Anderson, 146 Mich. 328, which was a condem-

nation proceeding, an objector to the laying of tracks along a certain street in Boyne City offered in evidence a phonographic record of sounds claimed to have been made by the operation of trains in proximity to a hotel. In affirming the admission of this record, the court said: "With proper proofs, such as were fully given in this case, to justify the introduction of the instrument as a substantially accurate and trustworthy reproducer of the sounds actually made and testified to, we think its use legitimate. Communications conducted through the medium of the telephone are held to be admissible, at least in cases where there is testimony that the voice was recognized. . . . The ground for receiving the testimony of the phonograph would seem to be stronger, since in its case there is not only proof of the human witnesses of the making of the sounds to be reproduced, but a reproduction by the mechanical witness of the sounds themselves." See, also, Loring v. Boston Elevated R. R. Co., referred to in Wigmore on Evidence (supplement, section 795), 10 Am. & Eng. Ann. Cas. 285, 22 Corpus Juris, 766.

Photography and the mechanical reproduction of sound being both admissible in evidence, we see no reason for refusing to accept the combination of the two mediums, when the results are shown to be accurate and reliable. Up to the present time, there are very few reported decisions dealing with the admissibility of motion pictures. It may be well, however, to review briefly the few cases that exist, in order to note the trend of the modern judicial mind upon the subject. In Pandolfo v. United States, 286 Fed. Repr. 8, the trial court was sustained in refusing to admit a motion picture of a manufacturing plant in operation. That case was a prosecution for using the mails in furtherance of a scheme to defraud. The defendant offered in evidence a motion-picture photograph of a manufacturing plant in operation to rebut the contention of the Government that he had no plant in existence. It was testified that, in 1918, the picture was prepared for advertising purposes, and the photographer testified that the film reproduced conditions as he found them. On the trial, the defendant offered to exhibit this film to the jury. Although indicating that, if photographs were admissible, films should be also, the lower court refused to receive the one offered, upon the ground that it was not accurate. On review, the upper court said: "Under the circumstances disclosed, we cannot say that there was error in this ruling. . . . The fact of operation, and the manner thereof, were not at all in dispute, and the question of permitting the moving picture to be displayed before the jury was so far within the discretion of the court that, while it might not have been error to have received it, it was not error to exclude it."

In De Camp v. United States, 10 Fed. Repr. (2nd Series) 984, where a somewhat similar offer of evidence to that made in the Pandolfo case was rejected, the Court of Appeals of the District of Columbia approved the rejection, saying: "Testimony was produced on behalf of the defendants, tending to show the process of manufacture of glass caskets of different sizes and in all stages, and with this evidence before the jury it was for the trial court to determine whether a photograph or moving picture, such as was offered, was sufficiently verified as a proper representation of the process of manufacture as it actually existed. This court will not assume, on this record, to determine this question, and if, as contended by counsel for appellant, the testimony relative to the process of manufacture completely verifies the picture, then he cannot successfully claim injury from the refusal of the court to repeat this testimony to the jury by a moving-picture display of the facts already in evidence. This is not the case of a photograph used to show the relative positions of different objects or to reconcile disputed issues of fact. The proofs as to condi-

tions of manufacture at the Oklahoma plant were testified to by witnesses presumed to be familiar with existing conditions; hence the admission of the motion pictures would have amounted to nothing more than a spectacular display of a situation based upon facts in evidence."

In Feeney v. Young, 191 N. Y. (App. Div.) 501, which was a suit to recover damages for the public exhibition of a moving picture of a patient while being operated upon, the trial court rejected the picture, apparently holding that the evidence of eye-witnesses who had seen the production and identified the individual being operated upon in the picture as the plaintiff was the best evidence. The reasoning by which this conclusion was reached seems to us to lose sight of many of the fundamental principles underlying the admission of photographs and evidence of this character, and it is probable that, since the small size of the pictures on the film itself rendered them practically valueless for identification purposes, the controlling reason for the court's action was a want of mechanical means at the time to reproduce the enlarged picture on a screen.

In a short article in 2 N. Y. Law Rev. 96, 160, it is reported that in the Mooney bomb outrage in San Francisco a moving picture of the progress of a parade was admitted in evidence, although the appellate court did not pass upon the point of its admissibility.

In Gibson v. Gunn, 206 N. Y. (App. Div.) 464, the plaintiff was permitted to offer in evidence a motion picture of his vaudeville performance prior to the occurrence of the accident which was the basis of the suit, it being his contention that his possession of an artificial limb before the accident did not impair his earning capacity as an actor. The reviewing court held the admission of the evidence to be error, because it was hearsay and incompetent and tended to make a farce of the trial, the plaintiff's ability as a vaudeville performer not being the issue.

In connection with these authorities, it may be well to note that the question under consideration has not escaped the attention of writers on legal subjects. In an article in 15 Ill. Law Rev., at page 123, Professor Wigmore discussed the evidential value of motion pictures and suggested an addition to his treatise on Evidence. After discussing the admissibility of moving pictures of reconstructed scenes, he says: "But where the moving picture is taken *without artificial reconstruction, i. e.,* at the time and place of the original event (a possibility not infrequent), it lacks the above element of weakness and is entitled to be admitted on the same principles as still photographs. The only circumstance then to be considered is that in a few matters, such as speed and direction of human movement, or relative size in the focus, the multiple nature of the films requires special allowances of error to be made; but these allowances are no different in kind from the elements of error inherent under certain conditions in still photographs."

See, also, the valuable and exhaustive reference to authorities upon this and analogous subjects by William B. Rudenko in the University of Pennsylvania Law Review of February, 1930, page 566, to which the writer acknowledges indebtedness for much of the material here used.

As pointed out by Professor Wigmore in the article quoted above, much can be said against the reception of a motion picture of a reconstructed scene. Such a picture is no more than an argument or visual statement of the contention of the party offering it, as to what actually occurred at a time and perhaps a place different from the act under consideration, and by its apparent verisimilitude is likely to confuse the minds of jurors and lead them to view the reconstructed scene as the reality, notwithstanding cautions by

court or counsel to the contrary. Such a picture would thus receive more weight than it would be entitled to. Where, however, the picture presented is not that of a reconstructed scene, but of the occurrence under investigation, there seems to be nothing in reason or authority which would prevent its acceptance in evidence. If true, its very impressiveness would give to it an inherent weight that its accuracy would justify; and, in our judgment, it would go far, in the case of the photographing of confessions, to negative the contention, so often falsely made, that a confession was secured by force and coercion, or to disclose circumstances indicating the presence of such impropriety, if it existed. The written and oral confession is constantly attacked by charges that it was improperly procured by violence and intimidation. When that is the case, the jury has nothing, in the absence of evidence of the kind under consideration, but the word of the witnesses on the one side, and the other as to the dispute. While it may be conceded that violence may precede a confession without appearing in the motion picture, its absence, at least at the time the confession is actually made, can be definitely established by such a picture. The talking motion picture also furnishes a visual and auditory record of those natural gestures, mannerisms and tones of voice that so graphically illuminate the import and sincerity of a confession. These are the elements of strength which the mere production of a paper or the oral testimony of witnesses lack, and in honest and responsible hands would, it seems to us, lend strength and confidence to confessions of all kinds.

In conclusion, it may be noted that, apart from the confession offered in evidence in this case, the testimony overwhelmingly established the guilt of the defendant. Stolen property from each of the houses burglarized was found either in the defendant's possession or that of others who derived possession of it from him, or from places where he had disposed of it, and to which he directed the authorities in their search. This alone would have required his conviction, and, although a jury may not consider his failure to take the witness-stand and deny his guilt, a reviewing court cannot entirely overlook the implication arising from his failure to answer the charges against him. We, therefore, conclude that the trial court did not err in admitting the movie-tone confession offered in evidence in the case. Accordingly, the motion for a new trial is overruled.