ROBERT WOSOBA, Appellee, v. PAUL KENYON et al., Appellants.

No. 41360.

JUNE 24, 1932.

REHEARING DENIED OCTOBER 28, 1932.

Harry Wifvat, for appellee.

Burton Russell, and Putnam, Putnam & Forrest, for appellants.

KINDIG, J.—In the evening of October 30, 1930, the plaintiff-appellee, Robert Wosoba, and his companion, Francis Webber, drove east from Perry in a Chevrolet touring car. After they had traveled a few miles on the paved highway, they arrived at an "S" curve, when the motor, because of some mechanical defect, stopped running. Although the engine had ceased running, inertia nevertheless caused the automobile to go forward, and the driver turned it to the side, onto the shoulder of the road. There the car stopped, and appellee and his companion attempted to repair it. Some time was spent in this endeavor, but finally appellee and his companion decided that they could not remedy the defect. So they concluded to turn the car around and push it back over the pavement to Perry.

Francis Webber, appellee's companion, put one hand on the steering wheel and the other on the front fender, in order that the car might be pushed forward and guided in the meantime. Appellee at the same time went to the rear of the car and pushed from there. As appellee and his companion were thus proceeding forward toward Perry, the defendant-appellant Paul Kenyon and Glenn Scott were operating another vehicle in the same direction behind them. When appellant and his companion approached the car being pushed by appellee and his companion, the former did not see the stalled automobile until they were within ten feet thereof. Consequently appellant ran into the stalled car and crushed appellee against it, thereby causing him severe and permanent injuries. For the purpose of recovering damages for those injuries, the appellee commenced this action against both the appellant Paul and the

228

defendant-appellant Wylie Kenyon, but for some reason the cause proceeded to trial against the appellant Paul Kenyon only. Convenience, therefore, dictates that hereafter when the word "appellant" is used, it shall refer to Paul Kenyon alone.

A jury returned a verdict for the appellee, and the appellant appeals from the judgment entered thereon. On the appeal three propositions are argued by the appellant. Two of appellant's complaints relate to the trial court's instructions to the jury, and one of the appellant's objections relates to the district court's ruling on evidence.

 I. It is claimed by the appellant that the district court errer in instructing the jury concerning the amount of damages it should allow the appellee providing the appellant was negligent.

In his petition, the appellee asked for $20,000 general damages. Then, in an amendment to the petition, the appellee demanded additional damages for expenditures made by him in the following itemized amounts: Hospital expenses, $1,152.70; doctors' bills, $812; braces for leg, $45; nurse's bill, $641; incidental expenses, $11.25; ambulance service, $115. Thereby the total amount of the damages asked by the appellee was $22,776.95.

When instructing the jury concerning the amount of damages which it might allow the appellee, the district court said, in Instruction Number 17, that such sum "must not exceed the amount of $22,776.95." By so doing, the district court did not limit the amount of such recovery for general damages to the amount of $20,000. Nor did it limit the amount of the aforesaid itemized damages to the sum named in the petition for each item above designated. Hence the appellant claims that the district court was in error.

Concerning a somewhat similar question, this court said in Sergeant v. Challis, 213 Iowa 57, on page 66:

"Relative to the measure of plaintiff's recovery, the court told the jury: 'If your finding is for the plaintiff, then you are instructed that you are to allow the plaintiff damages for such loss and injuries, and for such loss and injuries only, as you find from the evidence necessarily resulted from the collision complained of. In no event, however, will you allow the plaintiff a sum in excess of $6,656.00.' This instruction cannot be upheld. The plaintiff in his petition alleged a specific amount of damage for loss of time, a specific amount for nursing and caring for him, and a specific amount for permanent impairment or injury, and asked judgment

for all of the same in the sum of $6,656.00. The court, in the aforesaid instruction, does not tell the jury what elements may be considered by them in fixing the amount of plaintiff's recovery, nor fix the limit of recovery for the different elements mentioned in the petition to that alleged in the petition, nor as shown by the evidence relative thereto."

Therefore, because of the foregoing pronouncement in the Sergeant case, the appellant insists that the instruction given in the case at bar is erroneous. Manifestly the district court should have told the jury that in allowing appellee damages for the doctor bill, no more could be allowed than the amount claimed therefor in the petition. Likewise, the district court should have repeated this thought concerning each item of damages asked: that is to say, appellee could not recover for any one item of damages listed a greater sum than the amount specifically asked therefor in the petition. So, too, the jury could not allow a greater sum than the aggregate amount asked in appellee's petition for the total damages. Of course, in no event could the jury allow any sum, even within the limitations above named, not supported by the evidence.

Wherefore, the instruction before mentioned, when considered alone, is erroneous. It is obvious, of course, that instructions must be read together. The appellee argues, therefore, that when the foregoing instruction is read in connection with Instruction 15, the apparent error is overcome. In this second instruction, the district court told the jury that it could allow appellee for no item of damage a greater sum than "established by the evidence." Accordingly, it is the further contention of the appellee that the evidence in the case at bar established the various items of damages named in the petition, and nothing more. To put the thought differently, it is appellee's claim that the evidence did not support any greater amount of damages for any item than the amount demanded therefor in the petition. This being true, it is appellee's conclusion that even though the instructions were not as complete and full as they should have been, the appellant is not prejudiced, under the circumstances. There could be no prejudice under the record, the appellee asserts, because the evidence does not sustain any greater amount of damages for any item claimed than the sum asked. therefor in the petition. A careful reading of the record indicates that this is true, with the possible exception of the general damages. $20,000, as before indi-

cated, is the amount claimed in the petition for general damages, but the verdict of the jury on all damages was only $7,700. So it is apparent that the jury did not allow more than $20,000 general damages.

All the evidence offered by the appellee sustains each item of damage to the amount claimed therefor in the petition, with the exception possibly of the general damages. But there is no evidence supporting any amount of damages for any such item above the sum asked therefor in the petition. Under the circumstances, then, the error of the district court in no way prejudiced the appellant. That being true, the appellant is not entitled to a new trial on this ground. See generally Harriman v. Roberts, 211 Iowa 1372; Butler Mfg. Co. v. Elliott & Cox, 211 Iowa 1068; A. Y .McDonald Co. v. Morrison, 211 Iowa 882; Eilers v. Frieling, 211 Iowa 841; Siesseger v. Puth, 211 Iowa 775; Thielen v. Schechinger, 211 Iowa 470; O'Hara v. Chaplin, 211 Iowa 404; Foley v. Mathias, 211 Iowa 160.

II. Again, it is contended by appellant that the district court erred in instructing the jury on one ground of negligence relied upon by the appellee as a basis of recovery. Such ground of negligence relates to the duty of appellant to drive at no greater speed than would permit him to stop within the "assured clear distance ahead." Section 5029 of the 1931 and preceding Codes provides:

"Any person driving a motor vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and *no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead."* (The italics are ours.)

When instructing the jury upon this subject, the district court told that body that a failure to so control the automobile would be negligence upon appellant's part. The criticism of this instruction offered by the appellant is that the negligence therein referred to is not such as a matter of law, but *prima facie* only. Underlying appellant's contention is the thought that the instruction did not permit him to offer an excuse for violating the statute. Once more appellant refers to Sergeant v. Challis (213 Iowa 57), supra. There this court said, on page 65:

"It is the duty of all persons using the highway to comply with this provision of the statutory law; but, if it appears from all of the evidence to the satisfaction of the jury, that they could not reasonably do so, or that they have exercised ordinary care,—that is, such care as an ordinarily careful and prudent person in the same circumstances would have exercised in this respect,—then they are absolved from the statutory duty, and the presumption or prima-facie case of negligence arising from noncompliance with the statute has been overcome."

In the Challis case the question whether the violation of the statute was only prima-facie evidence of negligence, as distinguished from negligence *per se,* was not involved. What is said upon the subject in that case, therefore, was in response to the theory upon which the case was tried. There was no complaint of that theory on the part of either party. Consequently, without such objection concerning the theory of the trial in the Challis case, this court, in the language above quoted, simply acquiesced in the procedure thus adopted by the parties, and what was said in the opinion was not intended to apply to a case where the litigants have not adopted such a theory of the trial.

Because the district court in the case at bar, however, did not give an instruction similar to the quotation from the Sergeant case (213 Iowa 57), supra, appellant claims there is error.

Certain statutory violations constitute negligence as distinguished from prima-facie evidence of negligence. If the statute in fact has been violated by the appellant, he is negligent, and the only remaining question has to do with the proximate cause of such negligence. Under the circumstances, a violation of the statute can be nothing but negligence. It is negligence, as distinguished from prima-facie evidence thereof. A violation of the statute under consideration, then, in the case at bar would amount to negligence. Kisling v. Thierman, 214 Iowa 911; Codner v. Stowe, 201 Iowa 800; Faatz v. Sullivan, 199 Iowa 875; Hansen v. Kemmish, 201 Iowa 1008; Carlson v. Meusberger, 200 Iowa 65; Albert v. Maher Brothers' Transfer Co., 215 Iowa 197. The reader must properly distinguish between the rule here approved under the cases above cited on the one hand, and, on the other, certain decisions under a statute passed by the legislature in 1911 (Section 1571-m19, Code Supplement, 1913), which was repealed in the year 1919. This repealed statute declared that excessive speed was presumptive evi-

dence of negligence. Cases will be found, therefore, discussing this statute, in which the phrase "prima-facie negligence" was used. Such phrase, however, was employed because of the statute. A violation of a statute now, since the repeal of the aforesaid law, as before the repealed act was enacted, constitutes negligence, as distinguished from the prima-facie evidence thereof. Of course, it is always permissible for a defendant to show that he did not in fact violate a statute. Sometimes a statute specifically eliminates certain acts from those that might otherwise constitute its violation. But the statute under consideration contains no such provision. Consequently it is necessary to inquire whether or not, under the record, there was any evidence upon which a jury could base a finding that the appellant did not violate the statute. There would not be negligence under the circumstances if there were no violation of the statute.

According to the record, however, there was no basis upon which the jury could find that the appellant did not violate the statute. Nothing in the record indicates that it was impossible for the appellant to comply with the statute. Moreover, the evidence indicates that there was no circumstance over which the driver had no control which caused him to drive contrary to the statute. Also, there is nothing in the record to indicate to the jury that the appellant was confronted with an emergency not of his own making which brought about the statutory violation. To sustain these propositions, it is essential to turn to the record.

The claim is made by the appellant that the accident occurred after dark, and that his headlights made it possible for him to see forward 75 or 80 feet. Furthermore, the appellant claims that he did not see appellee's car on the highway until within ten feet thereof, and then could not bring his vehicle to a stop. His excuse for not having seen appellee's automobile before is that, as he approached, a third car came from the opposite direction, and the headlights thereof were so blinding that vision was not possible until that emergency passed. This circumstance was not mentioned by the district court in its instructions to the jury as a situation which would not amount to a violation of the statute.

Was it error, then, under the circumstances, for the district court to thus omit appellant's theory that he did not violate the statute? Obviously not. With the lights thus blinding him, appellant drove, according to the record, from 100 to 300 feet before the collision with appellee's car. During that entire distance appellant

could not see. Therefore, he had no vision ahead. When so doing, he jeopardized every person upon the highway ahead of him. No attempt was made by appellant to even slacken the speed of, or otherwise control, his automobile during the time he was thus blinded by the lights from the car driving in the opposite direction until the collision. Manifestly the appellant did not know who might be on the highway ahead of him. In brief, the appellant, under the circumstances, simply "trusted to luck." The very purpose of the statute is to prohibit such heedless and negligent operation of a motor vehicle on the highway. As a matter of law, therefore, it is apparent that the appellant's evidence. does not show a non-violation of the statute.

While discussing Greenland v. City of Des Moines, 206 Iowa 1298, this court said, on page 1301:

"On this night, rain and mist and an obscured wind shield interfered with visibility. * * * When visibility was lost, the car should ·have stopped. It availed him nothing to carry automobile lights if his wind shield was obscured. The loss of visibility and the venture of the driver to proceed without it were clearly the proximate cause of this accident."

Likewise in Ruth v. Vroom, 222 N. W. 155 (Mich.), on page 156, the Michigan Supreme Court declared:

"It is settled in this state that it is negligence as a matter of law to drive an automobile at night at such speed that it cannot be stopped within the distance that objects can be seen ahead of it; and, if a driver's vision is obscured *by the lights of an approaching car,* it is his duty to slacken speed and have his car under such control that he can stop immediately if necessary." (The italics are ours.)

So, in the case at bar, because of the statute above quoted, it was incumbent upon the appellant to so adjust his rate of speed that he could stop the automobile in the assured clear distance ahead. This duty was upon the appellant under all the circumstances, including the event of blinding headlights of a car approaching in the opposite direction. Therefore the evidence offered by the appellant in fact did not show a non-violation of the statute, and the district court properly refrained from submitting that theory

to the jury. There is no error here, then, requiring the granting of a new trial.

III. Finally, it is claimed by the appellant that the district court erred in admitting in the record certain X-ray exhibits. These X-ray "pictures" purported to show the condition of appellee's leg after the injury and while he was in the hospital at Perry.

The objection to the introduction of these exhibits is predicated upon the thought that the proper foundation therefor had not been laid. Said foundation was not properly laid, the appellant.argues, because: First, no witness who took or saw the X-ray sciagraphs testified that the same "truly represent the objects claimed;" or second, no witness who took the X-rays or saw them taken testified concerning the correct position of the patient "in relation to the tube and plate." When speaking generally upon the subject, this court declared in State v. Matheson, 130 Iowa 440, on pages 444 and 445:

"The process of X-ray photography is now as well established as a recognized method of securing a reliable representation of the bones of the human body, although they are hidden from direct view by the surrounding flesh, and of metallic or other solid substances which may be imbedded in the flesh, as was photography as a means of securing a representation of things which might be directly observed by the unaided eye at the time when photography was first given judicial sanction as a means of disclosing facts of observation; and for that purpose X-ray photographs, or sciagraphs, or radiographs, as they are variously called, have been held admissible on the same basis as photographs."

Nevertheless, it is essential, of course, that the proper foundation be laid before such exhibit may be admitted into the evidence. State v. Matheson (130 Iowa 440), supra; Herzog Medical Jurisprudence, Section 219; Baltimore & Ohio R. Co. v. Whitacre (Md.), 92 Atl. 1060; Ingebretsen v. Minneapolis & St. L. R. Co., 176 Iowa 74; 10 Ruling Case Law 1159.

If one competent to testify states that the sciagraph correctly portrays the condition of the body affected, the exhibit is admissible. Again, if one competent to testify describes the relation of the X-ray machine to the body and vouches for the correctness of such position, the exhibit is admissible, according to the authorities above

cited. Such testimony may be given by either the person who took the X-ray photographs or another who knows the facts.

On the other hand, however, if the proper foundation is not laid, of course, the exhibits are not admissible. In the case at bar the X-ray negatives were taken by Edna Larson, the superintendent of the King's Daughters Hospital. Appellee was taken to this hospital for treatment. Edna Larson was skilled in the profession of operating the X-ray machine. She had been specially trained in a school in Chicago for this very purpose. According to the record, she had been thus skilled for more than six years. Moreover, this witness explained the portion of the body exposed to the X-ray plate in each exhibit. Also, the witness said of each exhibit, "this shows that portion" of the body described. If, then, the negative "shows" a portion of the body, there is some indication that it does not portray something else. Obviously this superintendent of the hospital herself personally took these X-ray photographs for the apparent purposes of the doctor who was treating appellee. At least, then, there is circumstantial evidence supporting the correctness of the X-ray exhibits in this fact, together with the other testimony in the record. It is not likely that a superintendent of the hospital would distort the X-ray negative when she knew it was going to be used by the attending physician. Ingebretsen v. Minneapolis & St. L. R. Co. (176 Iowa 74), supra. See also State v. Matheson (130 Iowa 440), supra. The appellant does not claim that the X-ray negatives were distorted or that they exaggerated any condition in appellee's leg.

Dr. George Eldridge, testifying for appellee, declared:

"He [appellee] suffered a crushing injury, was semiconscious, delirious, one leg was badly crushed; he had suffered a compound fracture of the femur, also a compound fracture of the tibia, one of the bones between the knee and the ankle, and a fracture of the fibula, the other bone between the knee and the ankle. The wound above was large, and had been pierced by a large foreign body. The wounds were cleaned out and drained and a box splint put on it under an anesthetic. The wound above the knee was through the top portion. The muscular tissues were torn. The bleeding was extensive. Extension was put on the foot with wires from the end of the foot to pull the fragments of the tibia, the bone between the knee and ankle, to pull the fragments out so they would heal in a

straight line. A pair of ice tongs were imbedded into the bone above the knee, and more traction made towards the foot of the bed. These tongs were left on for about six weeks. The wound below the knee was opened up and particles of bone that had worked loose were taken out. I performed a skin graft above the knee, and the wound finally healed up. There was probably a hundred small patches of skin taken off his leg and grafted on this wound, but not under an anesthetic. The pain was intense for the first four to six weeks he was in the hospital. I imagine he had close to fifty hypodermics for the pain. These scars are deep and permanent. There is still danger of bone infection."

With that testimony, together with the other facts and circumstances appearing in the record, it is apparent that the district court did not err in admitting the X-ray exhibits.

Wherefore, the judgment of the district court should be, and hereby is, affirmed.—Affirmed.

WAGNER, C. J., and STEVENS, ALBERT, and MORLING, JJ., concur.

GRIMM, J. (dissenting). I cannot concur in the affirming opinion in this case. The instructions of the court upon the amount of damages which might be allowed were misleading, confusing, and prejudicial, and out of harmony with the recent holdings of this court in Sergeant v. Challis, 213 Iowa 57. No citation of authority is required in support of the rule that it is the duty of the court to, in clear and definite language, instruct the jury upon every issue in the case. The court did not do so in this case on the question of the amount of the recovery.

I do not agree with the holding of the majority opinion in reference to the "assured clear distance ahead" doctrine. Section 5029 of the Code of 1931 provides:

"* * * and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead."

I think the defendant should have been permitted to testify to the facts regarding the circumstances under which he came suddenly upon the stalled car and the court should have definitely instructed the jury that they might consider such evidence in determining whether the defendant was guilty of negligence.

The majority opinion is not in harmony with Sergeant v. Challis, 213 Iowa 57, and Kisling v. Thierman, 214 Iowa 911.

The majority opinion appears to me to be indifferent to existing conditions with which we are familiar and of which we must take cognizance. Modern transportation is necessarily geared to high speed. Motorists and all others on the highway must take this into consideration. These facts enter into the question of negligence. It is a matter of common knowledge that on many parts of the public highways, particularly on primary highways short distances from cities and towns, there are, in the evenings, what amounts to two parades, one going in each direction. For the most part, both parades are moving fast. On straight highways, it may safely be said that the average speed is perhaps 45 miles per hour, and it ranges from that to 50 miles per hour. Practically speaking, a person driving 45 miles per hour travels 67½ feet per second. To do this is the common custom and practice among motorists generally. There are, of course, exceptions, and some cars are so faulty that they will not reach that speed, and some drivers, by reason of infirmities or inexperience, cannot drive that fast.

It is a matter of common knowledge that, as a practical proposition, on a highway under conditions such as hereinbefore described, drivers are more or less handicapped by the glare of approaching lights. Immediately back of the glare of every automobile there is what might be called a "dark spot," caused by the glare of the approaching car, into which the lights of the driver's car do not penetrate. If this automobile traffic is to adhere strictly to the rule of so operating a car as to be able to bring it to a stop within the assured clear distance ahead, all such traffic must necessarily be reduced to approximately ten miles per hour. To limit primary highway transportation at night to such speed is unthinkable. All such facts and circumstances surrounding the driver of a car operating under such conditions, and who is a defendant in such an action as this, should go to the jury, under proper instructions of the court. They should be permitted to determine whether the driver was guilty of negligence.

In passing, it may be said that persons on the highways owe a duty to those behind them, as well as to those in front of them. The unusually slow driver is as great a menace on the road as the fast driver. While it is true that everyone has a right to be on the road, yet that right is a relative one, and it might easily be asked

whether, when the Chevrolet driven by the two boys in this case "died" on a crowded highway at night, they were without contributory negligence in endeavoring to propel the car by manual power on a crowded primary highway at night, knowing, as they must have known, that their presence as such a rate of speed must immediately become a menace to all ordinary automobile drivers, and that in so doing, they placed themselves in imminent peril.