ROBERT G. BECK, Appellee, v. BEN W. DUBISHAR and VERNON A. DUBISHAR, Intervenor, Appellants.

No. 47367.

(Reported in 36 N. W. 2d 438)

March 8, 1949.

Franken, Keyes & Crawford, of Cedar Rapids, and Putnam, Putnam & Putnam, of Des Moines, for appellants.

William Gray and Elliott, Shuttleworth & Ingersoll, all of Cedar Rapids, for appellee.

HAYS, J.—Plaintiff brought suit for property damage to his car due to a collision between plaintiff's car and car owned by defendant Ben W. Dubishar and being driven by defendant Vernon A. Dubishar. Defendants counterclaim for both personal injury and property damage. A jury returned a verdict for plaintiff and from a judgment entered in accordance therewith defendants appeal.

Four propositions are urged as a basis for reversal: (1) Error in overruling motion for a directed verdict and for judgment notwithstanding the verdict (2) refusal to give requested instruction No. 5 (3) refusal to give requested instruction No. 6, and (4) failing to submit an instruction on assured clear distance ahead.

The collision occurred at the intersection of two gravel country roads. Appellee was driving west on an east-west road. Appellant was driving north on a north-south road. At the intersection, as one approached it from the east, visibility to the south was obstructed by a cornfield. There was no obstruc-

tion of visibility to the north. Likewise, visibility of one approaching the intersection from the south was obstructed to the right or east, and was clear to the left or west.

Appellee approached the intersection from the east at an admitted speed of 50 to 55 miles per hour. Ahead and to the right, or north, there was no traffic, when, at a point about 100 feet east of the intersection, he first saw appellant's car as it entered the intersection from the south. He was unable to stop and collided with defendant's car.

I. Appellant's first contention is that appellee was guilty of contributory negligence as a matter of law and the trial court should have directed a verdict. This claim is based upon the alleged violation of section 321.288, Code of 1946. It provides:

"The person operating a motor vehicle or motorcycle shall have the same under control and shall reduce the speed to a reasonable and proper rate: * * *

"3. When approaching and traversing a crossing or intersection of public highways * * *."

Appellant cites three Iowa cases as authority for the proposition that a speed of 50 to 55 miles per hour is per se a violation of section 321.288, supra. The cases cited are not in point as to the factual situation nor as to the legal status of the respective parties. The cases are Lang v. Kollasch, 218 Iowa 391, 255 N. W. 493, Wimer v. M. & M. Star Bottling Co., 221 Iowa 120, 264 N. W. 262, and Young v. Clark, 226 Iowa 1066, 285 N. W. 633. All three cases were under section 5026.01, Code of 1939, which was repealed by chapter 175, Acts of Forty-ninth General Assembly, and what is now section 321.319, Code of 1946, was substituted. The cases of Wimer v. M. & M. Star Bottling Co. and Lang v. Kollasch, supra, involved left turns in the intersection while the Young case, supra, is based upon the theory that the defendant had entered the intersection prior to plaintiff and had the right of way.

In the case at bar appellee was approaching the highway from appellant's right and under section 321.319, Code of 1946, had the right of way. It is common knowledge that a speed of 50 to 55 miles an hour upon our highways is not

per se an unreasonable speed. Under appellant's theory anyone who approaches an intersection at such speed is guilty of contributory negligence. True, in many cases such speed and even many miles slower might constitute contributory negligence, while in other cases it might not. Many other elements than speed enter into the question. As stated in Davidson v. Vast, 233 Iowa 534, 541, 10 N. W. 2d 12, 16:

"Even if decedent were traveling at fifty miles per hour, we are not prepared to hold that he would thereby be guilty of contributory negligence as a matter of law. He had a right to assume, until he knew or in the exercise of reasonable care should have known otherwise, that any driver approaching from the east would comply with the statute governing the right of precedence."

Whether appellee acted with reasonable caution in approaching the intersection is clearly a question for the jury under this record.

II. Appellant takes issue with the refusal of the trial court to give appellant's requested instructions Nos. 5 and 6. Both of these instructions deal with the question of the assured clear distance ahead. They are both long and will not be set out at length. They both are incorrect statements of the law, as may be illustrated by the following excerpt from requested instruction No. 6: "In this connection you are instructed that it is the law of this state that, 'No person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead.' " The requested instruction in stating the law fails to include therein what is a very material part thereof, to wit, "such driver having the right to assume, however, that all persons using said highway will observe the law" (being section 321.285, Code of 1946). It would have been error upon the part of the court if it had given the instructions as requested. Central States Elec. Co. v. McVay, 232 Iowa 469, 5 N. W. 2d 817.

III. Appellant's final assignment of error is the failure of the trial court to submit to the jury, upon the counterclaim, the alleged specification of negligence as to the assured clear distance ahead rule.

It will be observed that appellee recovered a verdict at the hands of the jury which necessarily determined in his favor the negligence of the appellant, the proximate cause of the damage and the freedom of appellee from contributory negligence, which precludes appellant from a recovery under the counterclaim. Appellant is not therefore prejudiced by the failure to submit such issue, assuming, but not holding, that the same was properly in the case. Davidson v. Vast, supra. See also Angell v. Hutchcroft, 231 Iowa 1057, 3 N. W. 2d 147; Davis v. Hoskinson, 228 Iowa 193, 290 N. W. 497; Smith v. Pine, 234 Iowa 256, 12 N. W. 2d 236.

There being no error, the judgment of the trial court is affirmed.—Affirmed.

OLIVER, BLISS, GARFIELD, and MULRONEY, JJ., concur.

MANTZ, C. J., and HALE, WENNERSTRUM and SMITH, JJ., dissent.

MANTZ, C. J. (dissenting)—I respectfully dissent from the majority opinion and in so doing state my reasons therefor.

I. Robert G. Beck, plaintiff-appellee, at the time of the accident was twenty-one years old; he was a native of Massachusetts and had lived in Iowa a year; he held a pilot's license and was a flight instructor; he lived at Amana, Iowa, and was employed at the Cedar Rapids Municipal Airport. On the 29th day of July, 1947, he was driving from his place of employment to his home in a 1940 super four-door Buick sedan; the brakes were in good condition. He had gone over the road daily for three to four weeks and was thoroughly familiar with it and the intersection where the collision took place. He was traveling west on an east-and-west county road with crushed rock surface about twenty to twenty-five feet wide. The country was gently rolling and was downgrade towards the intersection for about three fourths of a mile. At the bottom of the grade the road intersected a north-and-south highway. Both roads were the ordinary county roads. There were no stop signs at the intersection. The exact width of the two roads does not appear in the record. However, it is a matter of common knowledge that county roads are sixty-six feet wide.

Along the south side of the east-and-west highway and up

to the intersection corner there was a wire fence. Just south of this fence was a field of corn which came up close to the corner post at the southeast corner of the intersection. This field of corn extended to the south on the east side of the north-and-south road. Weeds and bushes were also along said fence line, and in the corner. The corn was tasseled out on July 29, 1947, and completely obscured and obstructed the south view of the north-and-south highway to those approaching from the east and also the east view of those approaching from the south. Appellee admits that he could not see the north-and-south road south of the intersection, consequently, as he approached, to him it had a "blind" corner. It was a clear day, very dry and good visibility. Appellee was alone in his car.

To show the intersection and the general location there are set forth two exhibits. Exhibit 3 was taken east of the intersection looking west.

It will be observed that the tall post shown at the southeast corner of the intersection and the post shown on Exhibit 8 are one and the same. Exhibit 8 shows that the corn, etc. came up to the corner. (See following page for exhibits.)

The views of the exhibits are highly important as they show physical facts which existed at the time of the collision. All views were taken shortly after the collision.

I think that the attitude and demeanor of appellee as he drove over the highway and as he approached the intersection where the collision took place are best shown by quoting from his testimony as given on direct examination. After testifying to some preliminary matters he said:

"The traffic on the Airport Walford Road immediately prior to the accident on July 29, 1947, was very light, since I didn't see any other cars during the distance I drove. There was no obstruction to my view ahead as I approached this intersection. *There was obstructions to my view of the intersecting road from the south as I approached the intersection. That road was on my left. * * * I was proceeding in a westerly direction. There were obstructions to my view of the road to my left. There was a cornfield; it was in the southeasterly corner, and the corn at the time was high—grew right up [to] the fence.*

Exhibit No. 3

Exhibit No. 8

[Italics supplied.]* * * Q. Now, Mr. Beck, will you tell the court and jury just what you saw as you approached the intersection where the accident occurred? A. Well, the road ahead of me was clear and the road to my right was clear, and I saw no dust or no indication whatsoever coming from my left. Q. What did you do about looking as you approached the intersection? A. I looked both ways and could see nothing as I have stated, the road was clear to the right and ahead—but I could see nothing to the left. * * * Q. Could you, or not, see whether or not there was any traffic on that road? A. Yes, I could. Q. Was there? A. No, there was not. Q. In your own words tell what happened next, if anything? A. As I came down the downgrade from about *one hundred feet back*, I saw the Dubishar truck come out from behind the corn and I immediately applied my brakes, tried to avoid the accident, *but I just couldn't stop the car;* when I saw Mr. Dubishar, I would say he was traveling approximately twenty, maybe twenty-five miles an hour, and there was no indication of his slowing down or in any way attempting to do anything about it. [Italics supplied.] Q. Did you, or not, take your foot off the accelerator? A. Yes, I did. Q. And how far from the center of the intersection would you say you were when you first saw this other automobile? A. I would say approximately one hundred feet. Q. In other words, you were one hundred feet east of the intersection? A. That's right. Q. And when you first saw the other automobile immediately for the first time prior to the intersection, will you tell us just where it was? A. He was approximately 50 feet back from the center of the intersection, traveling north. Now that is on the road which was on my left side. He was traveling about 20 miles an hour, possibly 25. I did not at all observe the other car slackening its speed at any time. That is, prior to the time of the collision. At the time of the collision, the other car was right in the center of the intersection. The front end of his car was just at the intersection. He was in the south half of the intersection and his front end had reached approximately the center of the intersection. I did not observe the other car swerve or turn in any way. When I first observed this other automobile, I was approximately 100 feet east of the intersection. Q. How fast

were you going when you first observed the other automobile? A. My best estimate, about 50 to 55. Q. Was there any speed limit over this highway? A. No, there was not. It is a country highway. As I approached the intersection and saw the other automobile, I applied my brakes and my brakes functioned. My brakes were in good condition. I had about a week—maybe two weeks prior to the accident just relined all the brakes. The application of the brakes decreased my speed. I applied them very vigorously. The wheels skidded through application of the brakes. The left front end of my automobile and the right front wheel, bumper, and fender of Mr. Dubishar's car came together in the collision. My automobile, at the time of the collision, was right at the center of the intersection. The front end had reached the center of the intersection. Immediately after the moment of the impact, my car swerved off to the right and into the ditch * * * the car rolled up or hit the embankment on one side and came to rest at the bottom of the ditch on its four wheels. The other automobile, after the collision, came to rest—he was still on the road and facing in an easterly direction and was about 40 to 45 feet from the point of impact; he was on the north side of the road, with his wheels just about on the edge of the road. I opened the door of my car and got out—walked around the back of the car and went up onto the road. Then I had a conversation with the other driver right on the road beside the two automobiles. The two automobiles were 5—maybe 10 feet apart when they came to rest, and the other driver was out of his automobile. The other driver is Vernon Dubishar. I asked him if he was alright; he said, 'I don't know'; and I says, didn't you see me? and he says, 'all I saw was a dark blur just before we hit.' After the accident I examined the road over which I traveled immediately prior to the accident for tracks or skid marks, and I observed skid marks left by my automobile. These were east of the intersection. * * * I did not observe the other car decrease its speed at any time up to the time of and at the time of the collision. When I saw the other car it was 50 feet south of the center of the intersection. Q. And at that time it had—was it emerging from the cornfield, or from behind the cornfield? A. It was. Q. Prior to that time the fact that the cornfield was there prevented

the car from being observed by you? A. That's right. Q. After it started to come out you saw it for the first time? A. That's right. * * * My automobile was not repaired, I had estimates made on the repairs, it was sold for salvage."

On cross-examination appellee testified in part:

"I had worked all night at the airport, my hours there were from midnight to 8 in the morning, and my duties were working part time, just filling in for the time as night man, just in case any aircraft came in, to switch on the runway lights. I was not awake all night on duty, as it wasn't necessary. I had been employed at the airport approximately three or four weeks, and was familiar with the road I was driving on that morning. I had driven it every morning up to the time of the accident during the time I was employed. My home was sixteen miles from where the airport is. I was 100 feet from the center of the intersection when I first saw the defendant. I was then going about 50 to 55 miles an hour. My brakes were in good condition. Q. How far, can you tell us, in your best judgment, the center of the intersection is from the north and south road line that enters into the intersection? A. About 6 to 10 feet, maybe. Q. You understand what I am referring to—what I am referring to is the intersection line? A. Yes. Q. The intersection line is what we might term an imaginary line running north and south, with the road you were traveling on that goes into the intersection. A. That's right. Q. About 10 feet. So that it was about 90 feet from the intersection line, the north and south intersection line, when you first saw defendant's car? A. That would be about right. Q. In your best judgment? A. Yes. Q. And at that point you were going 50 to 55 miles an hour? A. That's right. Q. Prior to that time, as you were coming down that gradual slope you have referred to, about how fast were you going? A. I had been holding that speed pretty constant all along the road. Q. From the time you started from the airport? A. That's right. Q. Is there a farm east of the center of this intersection approximately one-half mile, as you recall? A. Yes, there is a farm. Q. About how far is that, approximately, from the intersection, in your best judgment? A. I would

say it is about three quarters of a mile, or closer to a mile, which has farm buildings on the north side of the road. Q. From those buildings to the intersection there are no curves in the road, it was straight down to the intersection? A. That's right. Q. So along that distance you were traveling at about the same speed? A. That's right. I applied my brakes real hard and the impact occurred approximately in the center of the intersection. My car struck the Dubishar pick-up truck on the right front. After the impact, my car went 30 to 40 feet and the Dubishar truck went 40 to 50 feet from the center of the intersection. * * * I noticed some skid marks made by my car, but I didn't measure them. They ran from the center of the intersection to the east. They didn't stop at the center, they went to the center and off towards my car. I noticed no other skid marks. Those marks were definitely made by my car. Q. Mr. Beck, I will ask you to state whether or not you had previously testified, which testimony was recorded, that the first time you observed the Dubishar car was when you were 50 feet from the intersection? A. I had previously testified that as far as I could tell it would be about 50 feet. Q. You now recall it was approximately 100 feet? A. Yes."

James Gildroy of the State Highway Patrol testified that he went to the scene of the collision soon after it happened— that he found the two vehicles; appellee's Buick in the ditch about 46 feet north from the intersection and the truck north on the highway about 50 feet; that the Buick was damaged in the left front, also on the right side where it went into the ditch; that the main damage to the Ford truck was on the right front and side; that the impact occurred practically at the center of the intersection; that this was shown by a deep road imprint at that point; that he used a steel tape to measure the skid marks made by appellee's car to the east to the point where the skid marks ran out; that the measurement of the deep skid mark was 83 feet. He testified that the traveled part of the east-west road was 20 feet and that of the north-south was 22 feet; that the southeast corner of the intersection was mostly blinded by weeds and tall corn and that these together obstructed the vision there for quite some distance.

The driver of the truck stated that as he approached the intersection he was traveling about 25 miles per hour; that when he was approximately 50 feet from the center of the intersection he made an observation to the east and when he did so he could see to his right approximately 100 feet from the center of the intersection; that he saw nothing. We quote:

"As I proceeded into the intersection, I again looked to my right and observed a car coming toward me very fast. That was the car which was a 1940 Buick automobile driven by Mr. Beck. When I observed the Beck car, in my best judgment it was going about 60 miles an hour. My car was struck. The impact occurred near the center of the intersection approximately. The right front wheel and fender of my car was struck by the Beck Buick. As my car was struck, it moved west from the impact approximately 60 feet and I was thrown out. Melvin Dubishar was thrown out also. One of the three calves was lying on the side of the road and the other two were up on their feet in the ditch north of the impact. My pick-up truck was on the north side of the east-and-west road. Both of these cars were west of the impact when they stopped. The Beck car came to a stop approximately 40 to 50 feet from the impact. After the impact, I immediately got out and went to the pickup to find my little cousin; he wasn't there so I looked around for him, and I seen something laying at the corner, and it was the calf laying there with broken legs. Then I walked back to my truck and he was laying on west approximately 10 feet past the pick-up after it stopped. I picked him up and was going right up to the neighbors. Melvin was unconscious. He was hurt, bleeding badly from the head. I was injured as a result of the accident. I had a fractured right wrist and two broken ribs on the right side. I had glass in my backbone. I had a conversation with Mr. Beck relative to how the accident occurred, following the accident. Mr. Beck said he was probably going 60 miles an hour coming from the east."

The driver of the truck stated that he could not see up the road to the east until he had passed the corner post; that he did not see the Buick until he was 15 feet from the center of the intersection; that he took his foot off the accelerator,

stepped on the brakes and that it must have slackened his speed.

As bearing on the speed of the Buick car two witnesses, Edwin Benish and his wife, testified that they saw the Buick go west past their place just before the accident. Benish says it was going better than 60 miles per hour. When Mrs. Benish was questioned as to the speed of the Buick car as it passed her home that morning, an objection that the question called for an opinion and conclusion of the witness and no proper foundation had been laid was sustained. While the point was not argued, I am of the opinion that the witness was qualified to pass upon the question of speed—she had driven an auto for seventeen years—had observed the speeds and stated that she could given an opinion on the matter. It should be remembered that as the Buick passed the Benish home it was going down a long straight grade.

II. The motion for directed verdict and for judgment notwithstanding the verdict should have been sustained. The record fails to show that the driver of the Ford was negligent. On the other hand it shows not only that appellee violated the statute (section 321.288, Code of 1946) but the manner in which he drove his Buick car as he approached and entered the intersection went beyond negligence and almost into the realm of recklessness. There can be little doubt-that the speed of the Buick automobile was the direct and proximate cause of the collision. He admits that he saw appellant's truck enter the intersection when he was at least 90 feet to the east—he gave 100 feet in answer to one question. He saw the truck, he slammed on the brakes, he tried to stop, his heavy vehicle skidded at least 83 feet, plowing deep skid marks and had he not collided with the truck, it is fair to assume that the skid marks would have been much longer. I inquire what does such a situation spell out? There is but one answer—speed, excessive and reckless speed—right in the face of an ever present and potential danger.

The appellee admits that the view south was obscured by shrubbery and corn right up to the very corner of the intersection. This is shown by the evidence and the physical facts. I suggest a careful examination of the exhibits attached hereto. Here we have an aviator driving a powerful and heavy vehicle

on his way home from night work. He says that his best estimate of his speed was 50 to 55 miles per hour. The owner of the Ford truck testified that appellee stated right after the collision that he was going approximately 60 miles per hour when he last noticed his speedometer, and that he was coming downgrade. Benish gave his speed as "better than sixty" three fourths of a mile east. The truck driver testified that right after the collision the appellee stated to him that he was probably going 60 miles per hour. He admitted that he was going downgrade at an even speed of 50 to 55 miles per hour; that he was about 100 feet east when the truck came into the intersection; that he tried to stop but could not. Along with the statements of appellee we must take the physical facts which stand uncontradicted. Let us take his figures as to speed and distances and see where we come out. The state of Iowa, through its Highway Patrol, has made numerous tests and issued charts dealing with speeds, distances covered and ability to stop. Such show that at 60 miles per hour 88 feet are covered per second; at 55 miles per hour 80.16 feet are covered per second, and at 50 miles per hour 73.3 feet per second are covered. Such charts further show that under normal conditions the normal driver at 50 miles per hour will travel 55 feet from the time an obstruction is seen until the brakes are applied. These figures show that at such speed a car will travel 186 feet before coming to a stop. If appellee was traveling 55 miles per hour and his car slid (skidded) 83 feet it must have been close to 150 feet from the place where he saw the truck to the point of impact. It should be kept in mind that the highway tests were made on level paved highways. On a rock surfaced or gravel road stopping distances would be more. In the present case there was crushed stone for surface. The appellee is a trained aviator. He was driving downgrade on a straight road in a heavy and powerful vehicle and at an admitted undiminished speed of from 50 to 55 miles per hour. We think that the physical facts and the evidence, other than his, show a speed of at least 60 to 65 miles per hour. He knew that he was approaching a blind crossing where his view to the left was entirely obstructed. He crashed into a truck which was in the intersection when ap-

pellee was at least 100 feet away. The effects point to terrific speed; both vehicles almost demolished; the truck driver badly injured—a small passenger thrown feet from the truck bruised and unconscious, and one calf with broken legs. The force of the impact was such as to whirl his Buick about off the grade into a ditch, striking a bank and coming to rest 46 feet away so damaged that it was never repaired and was sold for salvage. In his suit he seeks to justify his conduct, "I looked at a blind corner and saw nothing—I had. the right of way."

Chapter 321, Code of 1946, deals with Motor Vehicles and Law of Road. The part dealing with speed regulations is found in sections 321.285 to 321.288, inclusive. Section 321.288 in part is as follows:

"The person operating a motor vehicle or motorcycle shall have the same under control and shall reduce the speed to a reasonable and proper rate: * * *

"3. When approaching and traversing a crossing or intersection of public highways * * * or a steep descent, in a public highway."

It is to be remembered that the above statute was enacted for the safety of those upon the public highways. Its very purpose was to curb those who used the highways for speedways. We have held that speed in and of itself is not necessarily controlling, that other things are to be considered. The majority opinion cites the case of Davidson v. Vast, 233 Iowa 534, 10 N. W. 2d 12. The factual situation there is far different than in the present case. There, there was a conflict in the evidence of speed and whether or not the defendant, Vast, stopped or reduced his speed when entering the highway. There, plaintiff's driver was killed and the court held that in letting the case go to the jury the administrator was entitled to the benefit of the no-eyewitness rule. How could it be logically said under the undisputed record in the present case that appellee had his Buick sedan under control within the meaning of the statute? He states that he saw the truck come from behind the cornfield and enter the intersection; that he slammed on his brakes but could not stop. Prior to coming down hill at a high rate of speed he made no attempt to slow down. He knew the road,

the intersection, and that others might be approaching. His conduct openly and palpably violated the statute and all considerations of speed and safe driving. He clearly and plainly violated the statute and he is presumed negligent. See Kisling v. Thierman, 214 Iowa 911, 243 N. W. 552, and cases there cited.

In Davidson v. Vast, supra, we said that the propriety of any rate of speed depends largely upon all the facts and circumstances, including the vigilance of the driver and his care in matters other than speed; also, that in most cases the question of speed must be determined from the circumstances. We further said therein that it was difficult to isolate speed from other elements.

The majority opinion refers to various cases cited by appellant and states that they have no application due to statutory change. In Lang v. Kollasch, 218 Iowa 391, 394, 255 N. W. 493, 495, the court directed a verdict against the plaintiff on the ground that he was guilty of negligence. The court based its ruling on the failure of plaintiff to observe certain statutory requirements. Therein, this court set out and quoted from section 5031, Code of 1931 (identical with section 321.288, Code of 1946), and the other on the necessity of giving signals. To show that the control section was under consideration we quote from the opinion:

"In the instant case there is no question about the negligence of the defendant-appellee. He violated the statutory requirements by not sounding a signal of his approach of the intersection, by abruptly turning to the left without going to the right of and beyond the intersection, and *by not reducing his speed, and having his car under control on entering the intersection.* Neither is there any question as to the negligence of the plaintiff-appellant. He knew he was approaching a blind intersection; that he could not see vehicles approaching from the right; he made no effort to look to his right; *he failed to reduce his speed so that he would have his car under control in the event it was necessary to bring it to a stop or change its direction; and he failed to give any warning signal of his approach.*" (Italics supplied.)

In the cited case this court held that a failure to observe the statutory requirement was negligence per se and would prevent recovery. See also on this point, Kisling v. Thierman, supra, Wosoba v. Kenyon, 215 Iowa 226, 243 N. W. 569, Jarvis v. Stone, 216 Iowa 27, 247 N. W. 393, and Lang v. Siddall, 218 Iowa 263, 254 N. W. 783.

The majority opinion in referring to the cases of Lang v. Kollasch, supra, and Wimer v. M. & M. Star Bottling Co., 221 Iowa 120, 264 N. W. 262, disposes of them by saying that both involved left turns in an intersection and are therefore inapplicable. A careful study of these two opinions shows that much more was involved than simply turning to the left in an intersection.

We have quoted above from the Kollasch case to show that the court was considering what is now section 321.288, Code of 1946.

The Wimer case sets forth the various statutory requirements as to the rights of the road and among them section 5031 of the Code of 1931 (now section 321.288, Code of 1946) and holds that the driver of the Wimer car in failing to observe such statutes was guilty of contributory negligence as a matter of law, and reversed the trial court in submitting the case to the jury. In that case this court cites the case of Parrack v. McGaffey, 217 Iowa 368, 251 N. W. 871. Therein the court in speaking of the duty of a driver in entering an intersection said that such duty not only requires a driver to see that there is sufficient space to make the turn in safety, but also requires the driver to slacken the speed of his car to allow the approaching car to pass; that the exercise of ordinary care requires a driver even without statute, to control his car to avoid accident. To show the attitude of this court in such matters we set out its language as set forth on page 126 of 221 Iowa, page 265 of 264 N. W., as follows:

"The evidence in the case at bar conclusively establishes that the decedent, in entering the intersection just prior to the accident, failed to observe the provisions of the preceding quoted statutes. And we have held that the statutes governing the use and operation of vehicles on the public highways of the

state constitute a legislative prescription of a suitable precaution, or a fixing by law of the standard of care which is required in such use and operation, and that a failure to observe such standard of care must be held to be negligence. Carlson v. Meusberger, 200 Iowa 65, 204 N. W. 432; Kisling v. Thierman [supra]; Wosoba v. Kenyon [supra]; Parrack v. McGaffey [supra]; Lang v. Kollasch [supra]." The record in the cited case presents a state of facts from which it must be concluded "that the decedent drove his car, immediately prior to the accident, in a careless and heedless manner and in disregard of the rights or safety of others; that he was not driving his car at a speed that would permit him to stop within the assured clear distance ahead; that he did not have his car under control and did not reduce his speed to a reasonable and proper rate when he approached and traversed the intersection in question; that before making the turn to the left and changing his course, he did not first see that there was sufficient space to make such movement in safety; that in changing his course and turning to the left into the north and south road, he did not pass to the right of and beyond the center of the north and south road before turning. Reasonable minds cannot differ as to the construction of the record as above indicated. And it must be held that the decedent was guilty of contributory negligence as a matter of law and that such negligence contributed directly to the accident, if indeed, it was not the proximate cause thereof."

See also Swan v. Dailey-Luce Auto Co., 221 Iowa 842, 265 N. W. 143.

The majority opinion states that the holding in Young v. Clark, 226 Iowa 1066, 1070, 285 N. W. 633, 635, is based upon the theory that the defendant entered the intersection first and had the right of way. In that case plaintiff's intestate was driving a Terraplane west on an east-and-west highway while defendant's truck approached from the south. This court held that the trial court should have directed a verdict for the defendant. After discussing the evidence, the positions of the two vehicles as they approached the intersection, what the drivers did, the collision, skid marks, and the place where such vehicles came to a stop after the collision this court said:

"After a careful reading of the transcript, we are convinced that reasonable minds can arrive only at the conclusion that Mr. Young, in approaching and traversing the intersection, *did not have his car under control and was traveling at a rate of speed that made it impossible for him to control his car; that the Terraplane approached and entered the intersection at a far greater speed than the truck;* that the truck entered the intersection first and Mr. Young failed to yield the driver of the truck the right of way. The decedent, in violating the statutes, was guilty of negligence per se which contributed directly to his injuries and death and appellee's motion for a directed verdict should have been sustained." (Italics supplied.)

The facts in the last-cited case bear a striking similarity to the present case. There the gravel truck of defendant was going north, just as was the Dubishar truck in the present case. Plaintiff's intestate, Young, was driving his Terraplane west, just as was Beck in the present case. The evidence there showed that the Clark truck was first in the intersection. In the present case Beck, appellee, admits that the Dubishar truck came into the intersection when he, Beck, was east at least 80 feet. Thus, we can see the direct application of the statement of the court: "Mr. Young, in approaching and traversing the intersection, *did not have his car under control and was traveling at a rate of speed that made it impossible for him to control his car* * * *."

In the Young v. Clark case just referred to this court was construing and applying various enactments set forth in chapter 134, Acts of Forty-seventh General Assembly. Section 319 of said chapter deals with control of vehicles and is identical with the present law (section 321.288) ; section 340 of said chapter which deals with turning at intersections is identical with the present law (section 321.311). The statutes relating to turning at intersections—then and now—make no reference to speed. Hence, this court in deciding the Young v. Clark case was dealing not only with the rule of the statute at intersections but also those as to speed, control and stopping. (Section 319, chapter 134, Acts of Forty-seventh General Assembly, now section 321.288, Code of 1946.)

Regarding the claim of appellee that as he approached the intersection he had the right of way, yet this in itself would not relieve him of exercising due care. He would still be required to observe a lookout for others lawfully upon the intersecting highway and at the same time have his car under proper control. He says that he looked to his right and the road was clear; that he looked to his left and could see no one coming from that direction, and in the same breath he said that he could not see south of the intersection on account of the tall corn, bushes and weeds. The evidence stands uncontradicted that these obstructions came right up to the corner of the intersection. See Riess v. Long, 229 Iowa 378, 294 N. W. 592; Stein v. Sharpe, 229 Iowa 812, 295 N. W. 155.

It can hardly be said that one claiming the right of way at an intersection under section 321.319, Code of 1946, can at the same time deliberately disregard the safety requirements of sections 321.285 and 321.288. Assuming that appellant had the right of way (which I deny) I would like to have pointed out to me what appellee did to observe the provisions of section 321.288. True he says that he put on his brakes as soon as he saw appellant come into the intersection but he could not stop before the collision. May I inquire why he could not stop?— the answer—too much speed causing lack of control. Appellee deliberately chose to hurry homeward, disregarding the first essentials of due care at a blind corner and trusted to luck that nothing would happen. His gamble failed and it is a matter of wonder that the truck occupants were not killed—the boy was picked up unconscious and bleeding, about 60 feet from the point of impact and the driver was seriously injured. See the language of this court in the case of Wosoba v. Kenyon, 215 Iowa 226, 233, 243 N. W. 569, 573. In the case just cited this court said: "* * * because of the statute above quoted [section 5029, Code of 1931, now 321.285], it was incumbent upon the appellant to so adjust his rate of speed that he could stop the automobile in the assured clear distance ahead. This duty was upon the appellant under all the circumstances * * *."

It would be hard to conceive a state of facts wherein a careless, indifferent, negligent, not to say reckless driver, can

come into a court and blandly excuse his conduct by saying, "I had the right of way," and at the same time demand that the party directly injured by such conduct pay for the consequences of such misconduct. If recovery is permitted under such conditions, it seems to the writer that this court is placing a premium upon law violations. A studied and settled disregard of safety enactments and of the rights of those lawfully upon the highways should not be capitalized upon in any court of justice. We constantly hear discussions as to safety measures on our roads. Traffic accidents take a frightful toll. In Iowa, in 1948, according to the figures compiled by the Iowa Department of Public Safety, there were 561 auto fatalities. High, unreasonable and unnecessary speeds, coupled with disregard of safety regulations by take-a-chance drivers trusting to luck, contribute largely to this toll.

The verdict in this case rewards such actions. Appellant's motions for directed verdict and for judgment notwithstanding the verdict should have been sustained.

III. Regarding appellant's claim that the court erred in refusing to instruct the jury by giving requested instructions Nos. 5 and 6, I think that the court was in error in refusing to give said instructions. While they may not have been letter perfect, yet the trial court could not have misunderstood their meaning. Both contain correct propositions of law and the jury should have been so advised.

Under the record the doctrine of the assured clear distance ahead was directly involved. The truck was in the intersection, perfectly visible, and in the direct path of appellee's car, plunging ahead with unbated speed and described by the driver of the truck as just a *blur*.

The question of the stopping of the Buick sedan within the assured clear distance ahead was a pleaded issue, both in counterclaim and petition of intervention. The trial court was of the opinion that the question of stopping within the assured clear distance ahead was not an issue in the case. The two requested instructions embodying the pleaded claim of appellant were refused. The trial court gave no instruction on this issue, thereby eliminating such as a defense.

This writer is of the opinion that some instructions along the line requested should have been given. See Wells v. Wildin, 224 Iowa 913, 277 N. W. 308, 115 A. L. R. 169; Wimer v. M. & M. Star Bottling Co., supra; Schuster v. Gillispie, 217 Iowa 386, 251 N. W. 735; Sutton v. Moreland, 214 Iowa 337, 242 N. W. 75; Dennis v. Merrill, 218 Iowa 1259, 257 N. W. 322. I think that the record facts justified its giving. To ignore such issues might tend to mislead the jury. Under the record the truck could not be seen until it was into the intersection. The corner fence post at the southeast corner marked the south and east limits of the intersection. The corn and foliage were right up to the corner post. The truck had gotten into the intersection when appellant first saw it. The truck was plainly visible and I think the assured clear distance statute applied. For such errors in addition to the one first set forth, I would reverse.

HALE, WENNERSTRUM and SMITH, JJ., join in this dissent.